No. 90-539

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

JIM RICHARDSON,

      Claimant and Appellant,

   -v-

COLUMBIA FALLS ALUMINUM CO.,

      Employer,
  and

STATE COMPENSATION MUTUAL INSURANCE FUND,

      Defendant and Respondent.

APPEAL FROM:   Workers' Compensation Court
               The Honorable Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          John H. Bothe; Laurie Wallace; Bothe & Lauridsen;
          Columbia Falls, Montana

      For Respondent:

          Mark L. Stermitz; Warden, Christiansen, Johnson &
          Borg; Kalispell, Montana

FILED

MAR 28 1991

Filed:

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  February 21, 1991

Decided:   March 28, 1991

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Claimant, Jim Richardson, appeals from an order of the Workers' Compensation Court denying his claim for a neck or cervical spine injury. We affirm.

The issue is: Was there substantial evidence to support the Workers' Compensation Court's conclusion that Mr. Richardson had failed to establish that he suffered an industrial injury to his neck or cervical spine (hereinafter referred to as cervical injury) on November 4, 1987?

On June 25, 1984, Mr. Richardson was working as a pipe fitter at the aluminum plant in Columbia Falls, Montana, when he hit his head on a piece of angle iron as he was ascending a ladder to an overhead walkway. The force of the impact "jammed" his neck and resulted in a lump on his head. Mr. Richardson filed an accident report with his employer, but did not seek immediate medical treatment and did not lose any work time.

On November 4, 1987, Mr. Richardson was changing an air valve on a cylinder at the aluminum plant. Mr. Richardson was pulling on a 24 inch pipe wrench when the wrench gave way and he fell backward, striking his right elbow on a steel cylinder. The next day Mr. Richardson went to Dr. Spencer, family practitioner, for pain in his elbow. The following day he saw Dr. Spencer's partner, Dr. Winkel. He was diagnosed as having tendonitis of the elbow and was treated with anti-inflammatory medication, a tennis elbow splint, and was restricted from lifting more than 20 pounds with his right arm. He was told it would take three to four months for

2

the elbow to heal. Approximately four months later Mr. Richardson returned to Dr. Winkel complaining of severe headaches, pain across both shoulders, into the neck and down to the left elbow, and numbness in the first two fingers and thumbs of both hands.

Neither party disputes that Mr. Richardson suffered an industrial accident in 1984 that resulted in a cervical injury. The dispute arises over the nature and extent of the cervical injury suffered by Mr. Richardson in 1984 and the effect, if any, the 1987 industrial accident had on that injury. In 1989, Mr. Richardson filed a workers' compensation claim for his cervical injury resulting from the 1984 accident. The parties settled for $10,000. Mr. Richardson now brings this claim for aggravation of the cervical injury in the 1987 accident.

The Workers' Compensation Court determined that Mr. Richardson had failed to establish that he suffered a cervical injury in 1987. Mr. Richardson claims that the Workers' Compensation Court relied exclusively on the written report of Dr. Joern to support its conclusion and that a careful evaluation of the other examining and testifying physicians in the case would show that in fact a preponderance of the medical evidence weighed in Mr. Richardson's favor.

Where findings are based on conflicting evidence, this Court's function is confined to determining whether there is substantial evidence to support the Workers' Compensation Court's findings and conclusions. It is not this Court's function to determine whether there is sufficient evidence to support contrary findings. Morris

3

v. Montana Forward (Mont. 1990), 799 P.2d 1063, 1065, 47 St.Rep. 1942, 1943.

Mr. Richardson testified that when he fell back and hit his elbow in 1987, his head snapped back, aggravating his cervical injury. As evidence he states that it was only after the 1987 accident that he experienced any symptoms. In March, 1988, he developed severe headaches, pain across both shoulders, into the neck and down to the left elbow, and numbness in the first two fingers and thumbs of both hands. The Workers' Compensation Court found Mr. Richardson's testimony not credible because he had made no mention of his head "snapping back" in the 1987 accident until two and a half years had passed and he had settled the 1984 claim.

The Workers' Compensation Court had before it the depositions of five physicians and the medical reports of seven other physicians. A review of all the medical evidence supports the Workers' Compensation Court's conclusion.

The reports of the first examinations following the 1987 accident cover only the elbow injury. Mr. Richardson made no mention of the "snapping" of his neck when he described his accident to Dr. Spencer and Dr. Winkel. Dr. Winkel testified that when the cervical symptoms began four months later, he did not give it much thought in terms of whether the 1987 accident was related or not. He believes he recalls Mr. Richardson subsequently telling him about the "snapping" of his neck but he does not know exactly when and does not have it recorded in any of his written records.

Dr. Stephens, a physical medicine and rehabilitation physician

4

from Kalispell, did diagnostic tests on Mr. Richardson in March and April, 1988, shortly after Mr. Richardson began to develop the headaches and pains in his arms and shoulders. Dr. Stephens' written reports record the "jamming" of the neck in 1984 and the striking of the elbow in 1987. No mention is made of a "snapping" of the neck in 1987. Dr. Stephens testified that in his opinion the symptoms experienced by Mr. Richardson beginning in March, 1988, were the natural progression of degeneration resulting from the 1984 cervical injury. When Mr. Richardson's attorney asked him if his answer would be different if Mr. Richardson was asymptomatic prior to the 1987 accident, Dr. Stephens replied that might change his answer but that he considered it a purely hypothetical question which he was reluctant to answer.

In August, 1988, Dr. Friedrick, a Helena orthopedic surgeon, examined Mr. Richardson. He testified that there is no mention of the 1984 accident in his records, no mention of the neck being involved in the 1987 accident, and he had no recollection of ever having that information. He assumed that he was being deposed regarding the elbow injury.

In December, 1988, Mr. Richardson was examined by a Missoula medical panel to determine when the cervical injury occurred. The panel was made up of Dr. Norman, a neurologist, and two orthopedic surgeons, Dr. Sterling and Dr. Jacobson. The panel evaluation report was drafted by Dr. Norman and concluded:

> Question now arose as to relationship of elbow injury (11-4-87) and impairment of the cervical spine. Quite frankly, there is no clear relationship. There is no clear history of cervical spine injury or aggravation of

preexisting condition in history obtained relating to injury of November 4, 1987.

Discussion now turned to previous injury in July of 1984. Finally it was concluded on the basis of history and medical data available that it could not be determined when injury of the cervical spine occurred.

Dr. Norman's written records do not mention the "snapping" of the neck when he described the 1987 accident.

Dr. Peterson's written records also do not mention the "snapping" of the neck in 1987. In testimony however he testified that "I don't have any record that he actually struck his head or his neck with that particular accident [in 1987]. What he did was he stressed the head and the neck area, as anyone would. That suggests that there may well have been some problem present, kind of like a time bomb you're sitting on, waiting for something to happen to aggravate it." Therefore Dr. Peterson believed the 1987 accident precipitated Mr. Richardson's symptoms.

Dr. Sterling's written record also does not mention the "snapping" of the neck in 1987. Dr. Sterling expressed disbelief of Mr. Richardson's testimony that he had "snapped" his neck back, and testified that it was his opinion that the cervical condition was not caused by snapping of the neck. "...[T]he whole tenor [of my report and of the panel's final report] would have been different had the initial injury report said that he banged his elbow and snapped his neck initially rather than several months later."

Dr. Joern, a Kalispell physican, examined Mr. Richardson in August, 1989, and evaluated his condition based on his interview

6

and examination of Mr. Richardson and copies of all the records of the physicans who had examined or treated Mr. Richardson. Dr. Joern summarized the various medical records and gave detailed results of his own examination. Dr. Joern came to the conclusion that the symptoms were a natural progression of a cervical degenerative condition resulting from the 1984 accident, and that the confusion arises because in the 1987 injury "there was an overlapping of symptomatology due to the similarity of the distribution of the effected nerves from the neck through the elbow."

In light of the foregoing medical reports and testimony, we hold there is substantial evidence to support the Workers' Compensation Court's determination that Mr. Richardson failed to establish that he suffered an industrial injury to his neck or cervical spine on November 4, 1987.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices